UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HAYES BACALL,

     Petitioner,

v.

CATHLEEN STODDARD, *Warden*,

     Respondent.

Case No. 2:14-cv-13442
Honorable Laurie J. Michelson

---

## OPINION AND ORDER DENYING PETITION FOR HABEAS CORPUS [1]

This case primarily concerns a prosecutor's inaccurate statement during closing argument and how much it prejudiced the defendant. In 2010, Petitioner Hayes Bacall shot and killed his nephew, Saif Jameel. Bacall's defense at trial was self-defense. The only eyewitness to the shooting (other than Bacall) testified that the shooting was not in self-defense. But the witness also admitted that he did not see the first shots fired. The arresting officer testified that when he asked "what happened," Bacall said, "I shot my nephew, he owes me $400,000." But Bacall's English is poor and Bacall claimed he did not have an opportunity to clarify that the shooting was in self-defense. Bacall testified that he drew his gun when he met Jameel in the office of Jameel's gas station. But he also said that he knew Jameel had previously drawn guns on people in the past, that he knew there were guns in the office, and that Jameel attempted to take his gun. During closing argument, the prosecutor asserted that trial was the "first time" that Bacall had claimed self-defense. In fact, Bacall had made the claim numerous times in jail-house telephone calls while awaiting trial—a fact of which the prosecutor was apparently aware.

A Michigan jury convicted Bacall of first-degree, premeditated murder. His conviction was affirmed on appeal in state court.

Bacall now seeks a writ of habeas corpus from this Court. (R. 1.) His strongest claim is that the prosecutor's false statement about when he first claimed self-defense violated his rights under the Constitution and unduly influenced the jury's verdict.

While the issue is not free from doubt, the Court finds that the prosecutor's statement did not violate the Confrontation Clause of the Sixth Amendment and that the Michigan Court of Appeals reasonably found that the statement did not deprive Bacall of the fair trial guaranteed by the Fourteenth Amendment. For this and the reasons provided below, the Court will deny the writ.

### I.

### A.

### 1.

Hayes Bacall had a close relationship with his nephew, Saif Jameel. After Bacall came to the United States from Iraq, the two lived together (with others) in Bacall's father's home. (R. 6, PID 1568–69.) Bacall thought of Jameel as a "son" or "younger brother." (R. 6, PID 1580.)

Bacall began lending Jameel considerable sums of money in 2006. Jameel owned a BP gas station and asked Bacall for $50,000 to remediate a lot across from the station so that a Starbucks could be built there. (R. 6, PID 1575, 1579.) Bacall eventually lent Jameel over $350,000 for the Starbucks project, money Bacall obtained by taking out lines of credit against his home or his cash-checking business. (R. 6, PID 1582, 1586.) By 2009, Jameel had not paid back any of the $350,000 principal, instead paying only the interest that Bacall owed to the banks that extended the lines of credit. (*See* R. 6, PID 1583, 1650.)

In September 2009, Jameel stopped making even the interest payments. (R. 6, PID 1590–91.) And in March 2010, Jameel asked Bacall for more money: "[Jameel] started claiming that

2

he has a lot of loans out . . . he's getting behind, and if I don't give him any more money to complete his loan applications, uh, I'm going to be in trouble because I think I will not collect anything." (R. 6, PID 1592.) Jameel had not only borrowed money from Bacall, but had close to $1,000,000 in debts. (R. 6, PID 1434.)

According to one of Jameel's brothers, Samir Bacall, between January and July 2010, Bacall had mentioned hurting Jameel on about 15 occasions. (R. 6, PID 1104–05.) Samir recalled that the two would be talking business and then Bacall would "just jump to something and say your brother is giving me hard time, uh, I swear to you, you know, he will tell me, [we'd] always talk in Arabic or, you know, Chaldean, but the most time we talk in Arabic. He said believe me, trust me, I'm telling you I would, I'll sneak up on your brother and I'll kill him." (R. 6, PID 1106.) Samir also recounted a conversation with Bacall shortly before Jameel's death this way: "[Bacall said,] I'll empty the gun in [Jameel] and that's it, I don't care about life. He playing with my money, that's it, I'll kill him and I'll, I'll go to jail. And I used to tell [my uncle] do you want to to go to jail for the rest of your life. He said I can't take it no more, your brother is playing too much games with me." (R. 6, PID 1109.) Although Samir reported these threats to Jameel, Samir never reported them to the police. (R. 6, PID 1123, 1151.)

Sometime around June 2010, Bacall had a conversation with Jameel. According to Bacall, "[I told] him that you have not paid me my, the interest for 10 months . . . [and] nothing on the 400,000. This is my hard work, my wife's, my kids' hard work, my life. You played games with me, you were slipping, getting those monies from me. I started begging him, asking him to, say I plea with you in any way you want, uh, just give me, uh, you know, my interest. He said, uh, he said do you want it, you want your interest, who is going to give you your money to start with." (R. 6, PID 1604–05.)

In early June 2010, Bacall asked Jameel for money on the principal. (R. 6, PID 1606.) Jameel gave Bacall a $2,000 check—but postdated it until the end of June. (R. 6, PID 1606, 1651.) During the remainder of the month, Bacall constantly pleaded with Jameel "to make the check good." (R. 6, PID 1609.) In Bacall's words, "I kept on calling him almost on a daily basis to please make the check good, and he, uh, he started saying that please don't bother me, give me couple more days, uh, and I, you know, the phone calls keep going on asking him to please make the check good and he keeps saying don't bother." (R. 6, PID 1607.) Jameel made fun of Bacall "like in a Chaldean way, we say like I have my chin under his hand, uh, and he's, he has all my money so, uh, an then there's an expression like in Chaldean, like my hand under the rock, so . . . he was in control." (R. 6, PID 1610.)

An employee who worked at Jameel's gas station recounted a call between Bacall and Jameel a few days before the July 2, 2010 shooting as follows:

> Q. Were you close enough [to the phone] where you could hear the defendant, Hayes Bacall, yelling?
> A. Yelling.
> Q. Was he yelling at Saif [Jameel]?
> A. Yes.
> Q. When Saif would speak back to his uncle, was Saif yelling back at his uncle?
> A. Not at all.

(R. 6, PID 1531.)

About this same time, however, another gas-station employee stated that he saw Bacall and Jameel at the station laughing and joking. (R. 6, PID 1760–61.)

## 2.

On July 2, 2010, Bacall left his business in Detroit, Michigan (telling an associate he would see him the next day) and went to see Jameel at his gas station in Troy, Michigan. Bacall carried a gun. He had a permit for the weapon, obtained it because of the high-crime location and

4

dangerous nature of his check-cashing business, and would carry it with him when he needed to make deposits or "bring cash." (*See* R. 6, PID 1572–74.) Bacall went to see Jameel because Jameel was going to give him cash toward the $2,000 check. (R. 6, PID 1640.) Bacall recalled, "my feelings were I'm going to go talk to [Jameel] nice, uh, trying to convince him because I put myself in jeopardy and I'm trying to do, you know, do something." (R. 6, PID 1614.) On his way to Troy, Bacall called Jameel "about 10 times," but Jameel did not answer. (R. 6, PID 1680.)

A video recovered from the BP station and shown to the jury depicts what happened before and after Bacall's meeting with Jameel, but shows little of the during. The video shows Bacall entering the gas station and heading to a small back office. Danielle Iverson, who was working the cash register, testified that Bacall "looked mad" as he headed toward the office. (R. 6, PID 1065.) The video shows Bacall knocking on the back-office door (while looking back toward the front register), the door opening, and Bacall entering. Only part of the small office is shown through the doorway. Slieman Bashi, who had known both Bacall and Jameel for a long time (R. 6, PID 999), is shown sitting close to the door in front of a desk. Jameel, who is almost entirely out of the camera's view, is sitting behind the desk. Bacall is shown saying something to Bashi (Bacall says he shook Bashi's hand (R. 6, PID 1615)) and then Bacall closes the door. No activity is seen or heard on the video for about 16 seconds, at which point several gun shots are heard. The back-office door then opens slightly, only for about a second, with the video capturing a sliver of Jameel's body over the desk. Jameel's body is bouncing from the force of continued gunfire (presumably to Jameel's backside). Bacall is then shown opening the door to the office, with Jameel face down on the desk. Bacall exits the office followed by Bashi. Although it was disputed at trial whether Bacall or Bashi first told Iverson to call 911, the video does show Bacall telling her to call the police. The video then shows Bacall exiting the station,

returning briefly while Iverson is on the phone with the police, and then going back out in front of the station and pacing back and forth. It appears that, at that point, Bacall called 911 from his cell phone. (R. 6, PID 1620.)

Bashi and Bacall provided the jury with different accounts of what occurred in the back office.

Bashi admitted he was at the office that day because Jameel was supposed to pay him some money that he owed him. (R. 6, PID 1010–11.) Bashi told the jury that when he saw Bacall, Bacall appeared "upset." (R. 6, PID 1003.) He recalled that Bacall's attitude was "[y]elling somewhat, money, arguing." (R. 6, PID 1003.) When asked about Jameel's response, Bashi stated, "[Jameel] told him, uh, don't yell, why yelling." (R. 6, PID 1003.) Then, said Bashi, "[Jameel] was trying to get up, I think, he was like, uh, but [Bacall] didn't give him a chance. He started shooting." (R. 6, PID 1004.) But on cross examination, Bashi admitted that he had previously testified that Jameel had "got up" (*see* R. 6, PID 1025), which is consistent with a blood-splatter expert's testimony that Jameel was standing for at least one shot (*see* R. 6, PID 1361–62). The inconsistency in Bashi's testimony might be attributable to the fact that, as Bacall and Jameel were arguing, Bashi got up to leave and turned away from them. (R. 6, PID 1045–46.) Although it was established at trial that Jameel kept three guns in the back office—a rifle locked up against a wall, a semi-automatic on a safe under a second desk in the office, and a gun on top of a cabinet under some papers (R. 6, PID 1220–22)—Bashi testified that he saw no guns in the office and that Jameel never attempted to grab a gun. (R. 6, PID 1005.)

Bacall recalled the events inside the office much differently. According to Bacall, after shaking Bashi's hand, "Jameel jumped out of his, he got up from his seat, and he said, uh, who brought you here, like you, who brought you here." (R. 6, PID 1616.) Bacall told the jury: "like

[Jameel's] eyes opened up, uh, cha-, cha-, uh, his face started changing, uh—right from, you know, by looking at him, I got very scared just like something, I felt something in my body." (R. 6, PID 1617.) Bacall continued, "I got very scared. I put my hand on my gun. I tried to, uh, leave, there was no, no room for the door to get out. If I opened the door, I would either go towards [Bashi] or go towards him. . . . I pulled my gun, put it down, I wanted to make sure that I would be able to leave because I didn't want him to get to me first. Because, because I'm aware that he has a lot of weapons in the office and I had seen it. . . . I sta[r]ted telling myself what, why did I put myself in that situation, why did I come." (R. 6, PID 1617.) Bacall testified that at that point, "[Jameel] responded by saying—you are, you're pulling your weapon on me, I'll, I'll put it in your ass. He was trying to jump on me to pull it out of my gun, out of my hand. . . . If you are a man, go—shoot—if you're a man, shoot. That's when I started shooting." (R. 6, PID 1618.) When asked why he shot Jameel, Bacall testified, "I knew I was going to die. I was, I felt in danger. Because he had pulled a gun on, on tons of peoples with no reason. So how about, how about a person whom, whom he owes $400,000—what do you think he will do to him." (R. 6, PID 1620.) Bacall stated that when he was shooting, Jameel was "trying to go to his cabinet. And, and that's when I start, kept on shooting." (R. 6, PID 1620.)

At trial, Bacall expanded on his assertion that he was aware that Jameel had previously pulled guns on people. Bacall described being at his father's funeral and the valet telling Jameel that he could not park where he had stopped. (R. 6, PID 1596.) According to Bacall, "[Jameel] responded by saying—do you know who you're talking to. You want to stop me from parking here. Then he pulled the gun and put it in [the valet's] face." (R. 6, PID 1596.) Bacall also described a situation at his cash-checking business where Jameel exhibited similar behavior. A group of three came in and presented Bacall with a check not written out to them. (R. 6, PID

7

1599.) Jameel came out of the office (Jameel had just sold the business to Bacall) and told them to take their check and go. (R. 6, PID 1599.) Argument ensued, with Jameel eventually pulling a shotgun, showing the gun he had strapped to his side, and the one that he had "in his foot." (R. 6, PID 1600.)

Other witnesses testified about Jameel's possession of firearms. Jameel's wife admitted that she had told police that Jameel was always "strapped" (i.e., armed) and was always ready. (R. 6, PID 1445–46.) She also admitted to having told police that Jameel was under a lot of stress around the time of the shooting. (R. 6, PID 1434–35.) Iverson, who was working the BP register on July 2, testified that it was fairly common knowledge that Jameel kept a gun at the station and that he sometimes carried one. (R. 6, PID 1080–81.) Another BP station employee (the one who overheard Bacall yelling on the phone) similarly testified that he knew Jameel carried a gun and that he had guns in the BP station office. (R. 6, PID 1545.)

**3.**

Not long after the shooting, police arrived on scene. Officer Gregory Stopczynski, the first responder, saw Bacall pacing outside the BP station: "He was cooperative and I kind of took it—he was kind of like he had a eerie calmness to him." (R. 6, PID 863.) Stopczynski secured Bacall's gun. According to Stopczynski, "I asked him, what happened. . . . He said, I shot my nephew, he owes me $400,000." (R. 6, PID 855.) Bacall was eventually placed in the back of Stopczynski's police cruiser.

In the cruiser, Stopczynski, who was unsure whether Bacall had said that his nephew owed him $400,000 or the other way around, sought clarification. A recording from Stopczynski's cruiser captured the exchange:

> STOPCZYNSKI:      You, you owe your nephew four hundred?
> BACALL:              You owe me four hundred, [pause], thousand dollars.

8

| STOPCZYNSKI: | He owes you? |
|---|---|
| BACALL: | Yes. |
| STOPCZYNSKI: | Okay. |
| BACALL: | Yes. |
| STOPCZYNSKI: | So that's why you shot him. |
| BACALL: | Yes, I, I, I— |
| STOPCZYNSKI: | —Okay you know your rights, right? |
| BACALL: | Yes I'm right. |
| STOPCZYNSKI: | Constitutional rights? |
| BACALL: | Yes everything's right. . . . |

[Stopczynski reads *Miranda* rights in a questioning manner with Bacall saying "yes, yes"]

| STOPCZYNSKI: | Why did you shoot your nephew? |
|---|---|
| BACALL: | Because he give me hard time, almost a year [or all those years] he don't give me nothing. I, I,— |
| STOPCZYNSKI: | How many times you shoot? |
| BACALL: | I shoot him six times. |

(Police Car Video, File 184052 at 18:43:21 to 18:43:55.)

At trial, Bacall explained the foregoing exchange. (R. 6, PID 1623.) When asked if he recalled Stopczynski asking, "So that's why you shot him," Bacall told the jury: "There are a lot of phrases that, you know, I don't understand, uh, I think when, when he said all right, I thought he was, if I'm okay, if I'm like, uh, have a seatbelt or, you know, personally okay. That's how I understood it. Or, or I think, uh, he, he asked—that's how I understood it that what you did is all right and I think I was answering him—all right, all right." (R. 6, PID 1624.) Bacall also stated, when he answered, "Yes, I, I, I—," "I wanted to tell him, you know, what happened or how it happened but he like left, left or stopped or, you know, something happened that I did not finish what I was saying." (R. 6, PID 1624–25.) At trial, Stopczynski conceded that he interrupted Bacall to read him his *Miranda* rights. (R. 6, PID 881; *see also id.* PID 884.)

9

While in the back of the cruiser, Bacall, who still had his cell phone, received a call from Samir. Although their conversation was not in English, portions of the translation were read to the jury. Bacall said to Samir: "Hello, I killed—I killed your brother. I fucked his sister; I killed him." (R. 6, PID 860.) Samir testified that Bacall said, "I killed your brother . . . I just fucked his sister up"—this last part being an insult in Arabic or Chaldean. (R. 6, PID 1112.) At trial, Bacall explained the remark he had made to Samir, "when I said it is like, uh, I, I took [Jameel] first instead of him taking me—and like I had him for a first before he had me for dinner." (R. 6, PID 1627.) Bacall said that Samir immediately hung up: "I wanted to—I continued talking to Samir. He did not give me a chance, he hang up. He, he just, he just heard what he wanted to hear again and he did not hear the, the rest, and he hang up." (*Id.*)

**4.**

Bacall was detained pending trial. He made a number of calls while in jail. Although the transcripts of these calls were not introduced to the jury, attorney argument following trial makes plain that in seven of these calls, Bacall claimed that he killed Jameel out of self-defense. (R. 6, PID 1924, 1927.) The trial record also reflects that the prosecutor was aware of the content of these calls. (R. 6, PID 1168–69.)

**B.**

**1.**

Bacall's theory of the case was self-defense. During closing argument, Bacall's counsel stressed to the jury that Bacall thought of Jameel as a son and loved him to the extent that he put his own future on the line in lending Jameel money (R. 6, PID 1848–50); that Samir's testimony about Bacall's threats of harming Jameel were not credible given that Samir never went to the police (R. 6, PID 1850); that Jameel had threatened people with guns in the past (R. 6, PID

10

1865–66); that Bacall knew this (R. 6, PID 1867); that Jameel was stressed at the time of the

shooting (R. 6, PID 1866); that Bashi was not credible for a number of reasons (R. 6, PID 1858–

59); that Bacall only needed to have an honest and reasonable belief that Jameel was turning for

a gun when he fired (R. 6, PID 1867–68, 1874); that Jameel's bullet wounds are consistent with

Jameel turning toward a gun (R. 6, PID 1874); that Bacall did not flee the crime scene (R. 6, PID

1877); that Bacall's statements to Stopczynski were attributable to poor English and

Stopczynski's interruptions (R. 6, PID 1879); and that the prosecution needed to prove—beyond

a reasonable doubt—that Bacall did not act in self-defense (R. 6, PID 1840, 1843).

     In rebuttal, the prosecutor addressed several aspects of Bacall's closing argument,

including Bacall's claim of self-defense. In particular, the prosecutor told the jury,

> In English, the defendant says he killed his nephew for $400,000. That's the first thing out of his mouth when the officer asked him what happened. . . . Defendant never says self-defense to the police officer and the officer gives him three separate chances. . . . [A]fter the *Miranda* rights, the officer asks him again about shooting a nephew. He says—well, he hasn't given me anything in about a year. He never says self-defense or even anything like self-defense. And on the witness stand, defense counsel asked the defendant—well, why did you tell the officer, you know, you shot him because of $400,000—and the defendant slips up, he says—because that was the main reason at that time. So practice though he may, the truth shines through.
>
> *Now, at trial is the first time the defendant says self-defense*. The eyewitnesses tell you it's no self-defense. The victim never even touched the defendant. . . .
>
> The location of the gunshot wounds on the body of Mr. Jameel, that also shows that this is not self-defense. These are execution shots. . . .
>
> You know in your hearts what this defendant did was not self-defense. He could have gotten out of that office. He never tried to leave until after his gun was empty and after the victim was murdered. Any one of these shots, except for a couple, would have been immediately incapacitating. Does he walk out? No. He just keeps firing. That shows you it's not self-defense. This is about the defendant's rage, okay.

(R. 6, PID 1897–99 (emphasis added).)

The jury deliberated for two afternoons and a morning. At one point, the jury sent a note to the judge stating, "Can the jury decide on a verdict of a lesser cause when they are unanimous, even though some may feel a stronger verdict is what they believe?" (R. 6, PID 2043, *see also id.* PID 1952–54.) And, in announcing the verdict, this exchange took place:

> THE COURT: And I'm going to ask if you are the foreperson to please stand and read the verdict.
>
> THE FOREPERSON: Might I say this was not an easy decision and we . . . thought about it.
>
> THE COURT: No, I can tell.
>
> THE FOREPERSON: Very much so.

(R. 6, PID 1956.)

In the end, the jury convicted Bacall of first-degree premeditated murder. (*Id.*)

## 2.

Bacall appealed. He raised four claims of error in the Michigan Court of Appeals: (1) that the trial court violated his right against double jeopardy by directing the jury to continue deliberations after the jury was unanimous on a lesser charge; (2) that the prosecutor made several remarks during closing argument—including, "Now, at trial is the first time the defendant says self-defense"—that deprived him of both a constitutionally fair trial and his Sixth Amendment right to confrontation; (3) that the jury was impermissibly allowed to deliberate outside the jury room; and (4) that the trial judge erroneously failed to instruct the jury on the theory of imperfect self-defense. (R. 6, PID 1995.)

The Michigan Court of Appeals affirmed Bacall's conviction. *People v. Bacall*, No. 306269, 2013 WL 951084 (Mich. Ct. App. Mar. 5, 2013) (per curiam). Regarding the prosecutor's statement that trial was the "first time" that Bacall had claimed self-defense, the state appellate court found the remark "highly inappropriate." *Id.* at *4. The Michigan Court of

Appeals explained, "the prosecution concedes that it possessed several recordings of phone conversations in which defendant claimed self-defense. Therefore, the prosecutor's statement that defendant 'never said self-defense' before trial was clearly false." *Id.* at *4. Nonetheless, the Court of Appeals found that statement did not deprive Bacall of a fair trial: "Given the overwhelming evidence which includes the testimony of an eyewitness to the shooting, defendant's statements to the police and a videotape of some of the events themselves, we conclude that the prosecutor's improper statement did not deny defendant a fair trial and so we do not reverse defendant's conviction." *Id.* at *5. The state appellate court further found that none of Bacall's other claims of trial error warranted reversal.

Bacall sought leave to appeal from the Michigan Supreme Court, but the state high court was not persuaded that the questions Bacall presented warranted its review. *People v. Bacall*, 843 N.W.2d 147 (Mich. 2013).

### 3.

Bacall now seeks a writ of habeas corpus from this Court. (R. 1.) Although he has abandoned his claim for an imperfect-self-defense instruction, Bacall raises the other three claims that he asserted in the Michigan Court of Appeals.

### II.

The standard of review this Court applies to each of Bacall's claims depends on whether the claim was "adjudicated on the merits in state court[.]" 28 U.S.C. § 2554(d); *see also Johnson v. Williams*, — U.S. —, 133 S. Ct. 1088, 1097, 185 L.Ed. 2d 105 (2013). If the Michigan Court of Appeals already decided the claim "on the merits," the Antiterrorism and Effective Death Penalty Act of 1996 requires this Court to grant the state appellate court's decision deference. In particular, AEDPA prohibits this Court from granting habeas corpus relief with respect to any

13

claim that the Michigan Court of Appeals "adjudicated on the merits" unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). But "[w]hen a state court does not address a claim on the merits, . . . 'AEDPA deference' does not apply and [this Court] will review the claim *de novo*." *Bies v. Sheldon*, 775 F.3d 386, 395 (6th Cir. 2014).

### III.

### A.

Bacall claims that three remarks made by the prosecutor during closing argument deprived him of the fair trial guaranteed by the Due Process Clause: (1) that "trial [was] the first time" Bacall said self-defense, (2) that Bacall's "actions [were] no different than that of a loan shark," and (3) insinuation that Bacall lied on his gun-permit application. (R. 1, PID 16–21.) Bacall further asserts that if none of the three comments alone deprived him of a fair trial, together they did. (R. 1, PID 21.)

The Court begins with Bacall's claim that the prosecutor's assertion that he first claimed self-defense at trial violated the Due Process Clause.

This claim was adjudicated "on the merits" by the Michigan Court of Appeals. As noted, the state appellate court found that although "highly inappropriate," the prosecutor's statement "did not deny defendant a fair trial" given the other evidence of guilt. *Bacall*, 2013 WL 951084, at *4–*5. As such, the above-referenced AEDPA deference applies. *See* 28 U.S.C. § 2254(d).

"The 'clearly established Federal law' relevant here is [the Supreme Court's] decision in *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), which explained

14

that a prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Parker v. Matthews*, — U.S. —, 132 S. Ct. 2148, 2153 (2012); *see also Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) ("Even if the prosecution's conduct was improper or even 'universally condemned,' [*Darden*, 477 U.S. at 181], this court can only reverse if the statements were so flagrant as to render the entire trial fundamentally unfair.").

In assessing whether the Michigan Court of Appeals unreasonably applied the *Darden* standard, the Court compares the inculpatory and exculpatory evidence: the closer the case, the more likely the prosecutor's remark "infected the trial with unfairness." *See Darden*, 477 U.S. at 182 ("The weight of the evidence against petitioner was heavy[,] . . . [which] reduced the likelihood that the jury's decision was influenced by argument.").

In terms of the evidence supporting Bacall's defense, Bashi's account of what happened was not beyond reproach. He did not see the first shots fired and testified inconsistently about whether Jameel stood up during his confrontation with Bacall. Bashi also stated that he did not know whether Jameel owned or carried guns (R. 6, PID 1051, 1056)—a questionable claim given that Bashi had worked at the gas station at one point and Jameel was his "very closest friend." (R. 6, PID 1080–81, 1009.) And there was support for Bacall's account of what occurred: he called Jameel 10 times to let him know he was on his way, he knew Jameel had guns in the office, he knew Jameel had threatened people using guns in the past, the only way Jameel could repay him is if he was alive, and Jameel was under stress at the time of the shooting. As for Bacall's threats leading up to July 2, 2010, the jury heard that Samir failed to go to the police, suggesting that Bacall's statements were merely hyperbole. As for Bacall's failure

to mention self-defense to Officer Stopczynski, it is plain that Bacall has difficulties with English and that Stopczynski interrupted Bacall on several occasions.

On the other hand, as the Michigan Court of Appeals found, the case against Bacall was strong. The shooting was consistent with Bacall's alleged threats prior to July 2, 2010. And even discounting these threats as hyperbole, the record makes plain that Bacall was very upset about not being repaid. Bacall himself stated that he told Jameel, "This is my hard work, my wife's, my kids' hard work, my life. You played games with me, you were slipping, getting those monies from me." (R. 6, PID 1604.) Bacall "started begging [Jameel]": "I plea with you in any way you want, uh, just give me, uh, you know, my interest." (*Id.*) And Bacall's actions were consistent with his words: in June 2010, Bacall repeatedly called Jameel to collect $2,000—even though this was but a tiny fraction of what Jameel owed. Bacall's desperation to get something from Jameel lends credibility to Iverson's claim that Bacall was angry when he arrived at the station and to Bashi's claim that Bacall was upset and yelling in the back office. And while Bacall may have often carried his gun due to the nature of his cash-checking business, there was no testimony that Bacall planned to transport cash or checks on his way to see Jameel. Bacall fired 12 shots. This occurred within 16 seconds of his entering the office. Further, despite Bacall's poor English and Stopczynski's interruptions, the squad-car recording makes plain that there were opportunities for Bacall to tell the officer that Jameel had tried to attack him. One was when Stopczynski finished reading Bacall his *Miranda* rights and asked, "Why did you shoot your nephew?" Instead of referencing anything self-defense related, Bacall stated, "[b]ecause he give me hard time, almost a year [or all those years] he don't give me nothing. I, I,—." Further, while in the patrol car, Bacall spoke to Jameel's brother—in Chaldean or Arabic—and, instead

16

of directly saying that he killed Jameel before Jameel could kill him, he made an insult involving Jameel's sister.

Apart from the strength of the parties' cases, other factors pertaining to whether the prosecutor's "first time" comment deprived Bacall of a fair trial are mixed. In Bacall's favor is that the prosecution's comment called into question Bacall's only defense at trial. Add to that the fact that the jury struggled with its decision. On the other hand, the jury was specifically instructed that the attorneys' arguments were not evidence. At the outset of trial, the judge told the jury, "After all of the evidence has been presented, the prosecutor and the defendant's lawyer will make their closing arguments. Like the opening statements, these are not evidence." (R. 6, PID 806.)  And, after the prosecutor's closing remarks, the trial court again reminded the jurors that "[t]he lawyers' statements and arguments are not evidence." (R. 6, PID 1905.) These instructions reduced the risk of prejudice from the prosecutor's misstatement of fact. *See United States v. Olano*, 507 U.S. 725, 740 (1993) ("[We] presum[e] that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." (internal quotation marks omitted)).

In sum, given the considerable evidence suggesting that Bacall did not act in self-defense and the trial-court's instruction about closing argument, the Court cannot say that the Michigan Court of Appeals' finding that the prosecutor's "first time" remark did not deprive Bacall of a fair trial was contrary to *Darden* or involved an unreasonable application of the standard set out in that case. And a review of the trial transcripts reveals no unreasonable factual determinations. As such, Bacall's Due Process Clause claim based on the prosecutor's "first time" remark does not clear § 2254(d)'s bar to habeas corpus relief.

17

That almost suffices to resolve all of Bacall's arguments under the Due Process Clause. "Almost," because, as noted, Bacall asserts that two other remarks by the prosecutor, when combined with the "first time" remark, deprived him of a fair trial. During closing argument, the prosecutor stated:

> [PROSECUTOR]: Defense counsel says, oh, the defendant is a good guy for loaning his nephew the money. He's not doing this out of the goodness of his heart. He's charging interest from day one. *These actions are no different than that of a loan shark*. If you think about it—
>
> [BACALL'S COUNSEL]: Your Honor—
>
> [PROSECUTOR]: —he's asking for interest—
>
> [BACALL'S COUNSEL]: I'm going to object to that. There's no evidence that this interest was anything other than what—
>
> THE COURT: Overruled. This is argument.
>
> (At 12:20 p.m., court recording video stopped & restarted)
>
> [PROSECUTOR]: This defendant who used to be Hazim Dekho moves to Michigan. *He changes his name to Hayes Bacall. The defendant then applies for a Michigan concealed pistol license but the defendant fails to tell anyone that he had the unlawful discharge of*—
>
> [BACALL'S COUNSEL]: Objection—
>
> [PROSECUTOR]: —*a firearm*—
>
> [BACALL'S COUNSEL]: —there's no—
>
> [PROSECUTOR]: —*conviction*—
>
> [BACALL'S COUNSEL]: —testimony—
>
> [PROSECUTOR]: —*previously*.
>
> [BACALL'S COUNSEL]: —about this. . . .
>
> THE COURT: Overruled during closing argument. It's argument.

(R. 6, PID 1894–95 (emphases added).)

The Michigan Court of Appeals addressed— separately—both remarks. It found that the "loan shark" reference was proper because, earlier in the trial, "defense counsel [had] asked [Samir] Bacall whether defendant had charged the decedent a 20 percent interest rate like a 'loan shark.'" *Bacall*, 2013 WL 951084, at *3. As for the prosecutor's reference to Bacall's failure to

18

disclose his unlawful discharge conviction on his application for a gun permit, the Michigan Court of Appeals implied that the reference was improper given the trial court's ruling that the issue was collateral. *Id.* But, thought the appellate court, "[a]ny prejudice resulting from the prosecutor's remarks was cured" by the trial court's instruction "that the prosecution's statements and arguments are not evidence." *Id.*

The Michigan Court of Appeals' separate treatment of each of the prosecutor's remarks raises the question of whether AEDPA deference applies to Bacall's assertion that the three remarks—in combination—rendered the trial fundamentally unfair. Where a state appellate court affirms a conviction and explicitly addresses some of the defendant's claims of error but not others, a federal habeas corpus court is to presume that the unaddressed claims were implicitly rejected "on the merits." *See Johnson v. Williams*, — U.S. —, 133 S. Ct. 1088, 1094, 185 L. Ed. 2d 105 (2013). To be sure, this presumption is rebuttable when, for example, the state court's opinion and associated briefing suggests that the state court overlooked the defendant's claim. *See id.* at 1096. But the presumption remains when there is good reason to think that the state court did not feel the need to explain its rejection of a particular claim. *See id.* at 1095–96.

This is that case. For one, Bacall's cumulative prejudice argument was cursorily argued in his briefing to the Michigan Court of Appeals, essentially making the point in a single sentence. (*See* R. 6, PID 2031.) So the state appellate court could have thought it too underdeveloped to require discussion. *See Johnson*, 133 S. Ct. at 1095 ("Federal courts of appeals refuse to take cognizance of arguments that are made in passing without proper development. State appellate courts are entitled to follow the same practice." (citations omitted)). Further, a complete reading of the Michigan Court of Appeals' opinion suggests that the court implicitly rejected the cumulative prejudice claim. As noted, the state appellate court concluded

that the "highly inappropriate" "first time" remark did not deprive Bacall of a fair trial due to "overwhelming" evidence of guilt. *Bacall*, 2013 WL 951084, at *5. It would seem to follow that the state court implicitly found that the other two remarks—one which the court thought not improper and one which the court thought that any prejudice had been "cured"—would not, when combined with the "first time" remark, overcome the "overwhelming" evidence of guilt. So this Court will apply AEDPA deference to that implicit finding and ask whether it was contrary to, or an unreasonable application of, Supreme Court precedent.

It was not. The Court does not condone the prosecutor calling Bacall a "loan shark." Nor does the Court believe that the prosecutor should have referenced Bacall's omission on his gun application given the trial court's ruling that the omission was irrelevant. (*See* R. 6, PID 1662–63.) But the "loan shark" reference had little bearing on the central issue of self-defense. And while the gun-permit application went to Bacall's credibility, it did so only slightly. Further, the sting of the two statements was lessened by the objections, the trial court's response that the comments were mere attorney argument, and the court's instruction that argument was not evidence. The two remarks thus did not significantly alter the fair-trial calculus.

In short, the Michigan Court of Appeals reasonably concluded that the prosecutor's remarks during closing argument did not deprive Bacall of the fair trial promised by the Due Process Clause. As such, Bacall is not entitled to a writ of habeas corpus on this claim. *See* 28 U.S.C. § 2254(d).

**B.**

Bacall alternatively argues that the prosecutor's "first time" remark violated the Confrontation Clause of the Sixth Amendment.

20

Before turning to the merits of this claim, a threshold question again arises: does this Court adjudicate the claim in the first instance or does it defer to an implicit finding by the Michigan Court of Appeals? The answer is not obvious.

A review of the Michigan Court of Appeals' opinion suggests that this Court should decide the Confrontation Clause claim *de novo*. This is because the opinion—despite addressing all of Bacall's other claims in detail—does not mention the Confrontation Clause or the possibility that the prosecutor's statement of fact was testimony. *See generally People v. Bacall*, No. 306269, 2013 WL 951084 (Mich. Ct. App. Mar. 5, 2013). And the fair-trial analysis performed by the state appellate court does not comport with the harmless-error analysis that would apply if the court simply had presumed a Confrontation Clause violation. *See Chapman v. California*, 386 U.S. 18, 24 (1967). And this Court does not believe that the idea that a prosecutor's statement of fact could implicate the Confrontation Clause is so far-fetched that the notion did not warrant any discussion. All of this suggests that the Michigan Court of Appeals overlooked Bacall's Confrontation Clause claim and that this Court should evaluate the claim *de novo*. *See Johnson*, 133 S. Ct. at 1097 (providing that "[i]f a federal claim is rejected as a result of sheer inadvertence" it has not been "adjudicated on the merits" within the meaning of § 2554(d)).

But Bacall's briefing in the Michigan Court of Appeals suggests that AEDPA deference should apply. A review of that briefing reveals that Bacall intertwined his Confrontation Clause claim with his Due Process Clause claim. (*See* R. 6, PID 2020–26.) And it appears that the primary argument was that the prosecutor's "first time" remark violated the Due Process Clause. As such, this may be a situation, as with Bacall's cumulative error argument, where the Michigan Court of Appeals rejected the claim as inadequately developed and did not feel compelled to say

21

that in its opinion. *See Johnson*, 133 S. Ct. at 1094 ("[I]t is not the uniform practice of busy state courts to discuss separately every single claim to which a defendant makes even a passing reference").

In the end, the Court need not decide whether AEDPA deference applies. Assuming in Bacall's favor that this Court should assess his Confrontation Clause claim *de novo*, the claim does not justify a writ of habeas corpus.

To start, Bacall cites no case holding that, by making a misstatement of fact during closing argument, a prosecutor both becomes a witness and offers a testimonial statement for Confrontation Clause purposes.

And the Court's research has not uncovered any decision so holding. There are cases holding that when a prosecutor recounts what a non-testifying witness said, and the defendant lacks the opportunity to cross examine that witness, the prosecutor's conduct violates the Confrontation Clause. *See Douglas v. State of Alabama*, 380 U.S. 415 (1965) (finding Confrontation Clause violation where prosecutor, through questioning, introduced a witness's out-of-court statements inculpating the defendant and the witness could not be cross examined because he had asserted Fifth Amendment privilege); *United States v. Molina-Guevara*, 96 F.3d 698, 703 (3d Cir. 1996) (finding Confrontation Clause violation where, during closing argument, prosecutor implied to jury that a non-testifying agent would have corroborated testifying agent's testimony about defendant's confession); *Hutchins v. Wainwright*, 715 F.2d 512, 515–16 (11th Cir. 1983) (finding Confrontation Clause violation where, during closing argument, prosecutor essentially informed the jury that there was an eyewitness to the crime who identified defendant but who had not testified).

But this case does not involve the situation where the prosecutor recounted what a non-testifying witness said. This case instead involves an erroneous statement of fact made directly by a prosecutor during closing argument. This type of statement is not at the core of what the Confrontation Clause covers. *See United States v. Ellis*, 460 F.3d 920, 923 (7th Cir. 2006) ("The prototypical case of testimonial evidence is that created by the civil-law tradition of a judicial officer examining a witness in private and then later reporting the results in court." (citing *Crawford v. Washington*, 541 U.S. 36, 42–43 (2004))). And it is arguably not even at the Clause's periphery given that, as was the case here, juries are instructed that a prosecutor's closing remarks are argument—not evidence.

*United States v. Webster*, 400 F. App'x 666 (3d Cir. 2010), supports this view. There, probation officers found guns in an apartment that the defendant shared with his father. *Id.* at 667. The defendant was tried on felon-in-possession charges and, during closing, the prosecutor stated,

> So you didn't hear that [either the defendant's father or sister] when they first came back, sa[y], hey, there are guns in there that are mine. You didn't hear that evidence. There's no evidence on that point . . . .
>
> Nowhere in the course of the couch search, when [the probation officers] tell the parents, the family to stand up, when the family is standing there, when they are flipping the cushions, did you hear evidence that somebody said, hey, wait a minute. You're going to find a gun. I've got a gun.

*Id.* at 669. The defendant claimed that the prosecutor's remark about his father's silence violated the Confrontation Clause because his father had asserted the Fifth Amendment and thus could not be cross examined. *Id.* The Third Circuit disagreed: "The Confrontation Clause bars the admission of out-of-court testimonial statements by witnesses who are unavailable for cross examination at trial. No testimonial statements by [the defendant's] father were admitted, and the District Court specifically instructed the jurors that lawyers' statements are not evidence." *Id.* at

670; *see also United States v. Crowe*, 614 F. App'x 303, 306–07 (6th Cir. 2015) (finding that statement by co-defendant's counsel during closing argument was not "testimonial" and thus did not implicate the Confrontation Clause); *United States v. Taylor*, 509 F.3d 839, 850 (7th Cir. 2007) (finding that improper remark or mischaracterization of the evidence by counsel during closing argument does not implicate the Confrontation Clause because "[a]s every jury is instructed, lawyers' statements are not evidence").

Because Bacall has not cited any authority supporting his assertion that a prosecutor's statement of fact during closing arguments implicates that Confrontation Clause, and because there is good reason to think that the Confrontation Clause does not extend to such a statement, the Court declines to grant Bacall a writ of habeas corpus on his Sixth Amendment claim. *See Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) ("[I]n a habeas proceeding[,] the petitioner has the burden of establishing his right to federal habeas relief." (internal quotation marks omitted)).

## C.

Bacall also claims that he is entitled to a writ of habeas corpus because the trial court's instruction to the jury to continue deliberations placed him in double jeopardy contrary to the Double Jeopardy Clause of the Fifth Amendment. During deliberations, the jury sent a note to the judge that said: "Can the jury decide on a verdict of a lesser cause when they are unanimous, even though some may feel a stronger verdict is what they believe?" (R. 6, PID 2043, *see also id.* PID 1952–54.) In response, the trial judge gave the jury a modified *Allen* instruction, which included the following direction:

> If you believe the defendant is not guilty of first degree premeditated murder or if you cannot agree about that crime, you should consider the less serious crime of second degree murder or voluntary manslaughter. You decide how long to spend on first degree premeditated murder before discussing second degree murder or

24

voluntary manslaughter. You can go back to first degree premeditated murder after discussing second degree murder or voluntary manslaughter if you want to. . . .

I don't mean to suggest you haven't already done this but—when you continue your deliberations, do not hesitate to rethink your own views and change your opinion if you decide it was wrong. However, none of you should give up your honest beliefs about the weight or effect of the evidence only because of what your fellow jurors think or only for the sake of reaching agreement.

(R. 6, PID 1953–54.) Bacall claims that by "ignor[ing] the fact that the jury had a verdict," the trial court violated the Constitution's prohibition on double jeopardy. (R. 1, PID 27.)

The Michigan Court of Appeals rejected this claim. It explained:

Based on the jury's note, which stated that some jurors felt that a stronger verdict was appropriate, but did not indicate it was deadlocked on first degree murder, and the fact that the jury did not mark the second degree murder box on the verdict form, we conclude that the trial court correctly determined that the jury had not reached a unanimous verdict. Thus, the jury did not acquit defendant on his first-degree murder charge. Therefore, defendant's right against double jeopardy was not violated. Furthermore, because the jury was undecided, the trial court's instruction was appropriate.

*Bacall*, 2013 WL 951084, at *2 (citation ommitted).

This explanation by the Michigan Court of Appeals shows that it decided "the merits" of Bacall's double-jeopardy claim; as such, this Court does not address the claim *de novo*. Instead it applies AEDPA deference. And because the Michigan Court of Appeals made factual determinations in rejecting Bacall's double-jeopardy claim ("the jury had not reached a unanimous verdict" and had not "acquit[ed] defendant on his first-degree murder charge"), the question for this Court is whether Bacall has shown these factual determinations were "unreasonable . . . in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

Bacall has not. Although the jury's note indicates that all members of the jury had agreed that Bacall was guilty of at least second-degree murder or manslaughter, the note also plainly

25

indicates that some members of the jury thought Bacall was guilty of first-degree murder. And it is not obvious that the jury completed deliberations on first-degree murder. As that question of fact is debatable, the Court cannot say that the Michigan Court of Appeals' resolution of it was unreasonable. Bacall has thus not cleared § 2254(d), and the Court cannot grant him habeas relief on his double-jeopardy claim.

## D.

Bacall next claims that he is entitled to a writ of habeas corpus because the jury was allowed to deliberate outside of the privacy of the jury room. During its deliberations, the jury requested to see a firearm (presumably the one that Bacall used to shoot Jameel). As the trial court's policy was not to allow guns in the jury room, the judge permitted the jurors to examine the gun in the courtroom. After the jury came into the courtroom, the following occurred:

> [COUNSEL FROM THE PROSECUTOR'S OFFICE:] Ladies and gentlemen (inaudible words)—
>
> UNIDENTIFIED JUROR: (Inaudible words)—
>
> (Pause in courtroom)
>
> THE COURT: I don't, I prefer that we not sit here and try to listen to them—if you don't mind. These are jury deliberations and they should be—
>
> UNIDENTIFIED JUROR: Your Honor—
>
> THE COURT: —among them. Yes.
>
> UNIDENTIFIED JUROR: Can we get up and—
>
> THE COURT: Yes, yes. Feel free to go over there. Just pretend like we're not here.

(R. 6, PID 1941–42.) Bacall asserts that there were a number of people in the courtroom, including the prosecutor and possibly Bacall's family members, whose body language or mere presence could have influenced the jury. (R. 1, PID 37.)

Although the Michigan Court of Appeals rejected this claim, it did so by exercising "plain error" review. *Bacall*, 2013 WL 951084, at *5. And published precedent from our Court

of Appeals is in disagreement as to whether a state court's plain-error review amounts to adjudication "on the merits" warranting AEDPA deference. *Compare Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009) (finding that a claim reviewed by a state court for "plain error" can be considered "adjudicated on the merits" under § 2254), *with Frazier v. Jenkins*, 770 F.3d 485, 497 n.6 (6th Cir. 2014) ("We have repeatedly held that plain-error review is not equivalent to adjudication on the merits, which would trigger AEDPA deference."); *see also Frazier*, 770 F.3d at 506 (Sutton, J., dissenting) ("We have been down this road before, and [*Fleming*] tells us how to navigate it. It makes clear as day that a state court's plain-error review of an issue may receive AEDPA deference when the state court addresses the merits of the federal claim."); *Trimble v. Bobby*, 804 F.3d 767, 777 (6th Cir. 2015) (noting disagreement among *Fleming* and *Frazier* but declining to "enter th[e] debate" where claim failed under either AEDPA deference or *de novo* review). Because Bacall's claim fails under even *de novo* review, the Court assumes without deciding that the Michigan Court of Appeals did not adjudicate the claim "on the merits."

Bacall has identified no actual prejudice from the jury's apparently brief, public deliberation. Instead he merely speculates that the presence or body language of the prosecutor or others in the courtroom could have influenced the jury. (*See* R. 1, PID 37.) This possibility of harm is enough, Bacall suggests, because the jury's public deliberation amounted to structural error (*see* R. 1, PID 34)—"'a very limited class of errors' that trigger automatic reversal because they undermine the fairness of a criminal proceeding as a whole," *United States v. Davila*, — U.S. —, —, 133 S. Ct. 2139, 2149, 186 L. Ed. 2d 139 (2013).

The Court believes that *United States v. Olano*, 507 U.S. 725 (1993), forecloses Bacall's claim of structural error. There, two alternate jurors were allowed to be present in the jury room during deliberations under the instruction that they were not allowed to participate. *Id.* at 729. As

Bacall claims here, there was the possibility that the alternates could have influenced the jury through body language or by "chilling" deliberation. *Id.* at 739. In finding that the presence of the alternates did not affect the defendants' "substantial rights" as that phrase is used in Federal Rule of Criminal Procedure 52(b), the Supreme Court reasoned:

> Although the presence of alternate jurors does contravene the cardinal principle that the deliberations of the jury shall remain private and secret, the primary if not exclusive purpose of jury privacy and secrecy is to protect the jury's deliberations from improper influence. If no harm resulted from this intrusion of an alternate juror into the jury room, reversal would be pointless. We generally have analyzed outside intrusions upon the jury for prejudicial impact.

*Olano*, 507 U.S. at 737–38 (internal citations, alterations, and quotation marks omitted). The Court provided that while there may be cases were prejudice from intrusion upon deliberations could be presumed, at bottom the question was, "Did the intrusion affect the jury's deliberations and thereby its verdict?" *Id.* at 739. In labeling this as the "ultimate inquiry," the Court noted that in two cases involving considerable juror influence—including one where the bailiff had told the jury, "Oh that wicked fellow he is guilty"—it still inquired into prejudice from the influence. *Id.* at 739 (citing *Parker v. Gladden*, 385 U.S. 363 (1967); *Remmer v. United States*, 347 U.S. 227 (1954)). *Olano* thus cuts strongly against Bacall's claim that a jury's deliberation outside the jury room amounts to structural error. *See also United States v. Jadlowe*, 628 F.3d 1, 15, 20 (1st Cir. 2010) (finding that judge's instruction permitting jury to discuss the case during trial was not structural error even though the error had "framework" implications).

It is true that *Olano* was not addressing an alleged constitutional violation but instead the "affecting substantial rights" standard under Rule 52(b). But *Olano* itself indicates that it is not a material distinction: "Of course, the issue here is whether the alternates' presence sufficed to establish remedial authority under Rule 52(b), not whether it violated the Sixth Amendment or

Due Process Clause, but we see no reason to depart from the normal interpretation of the phrase 'affecting substantial rights.'" *Id.* at 739.

As the jury's in-courtroom deliberation was not structural error, it must either be the case that this Court can presume prejudice from the jury's courtroom deliberations or that Bacall can demonstrate it. The latter has already been addressed: Bacall has no proof of prejudice. As for the former, this is not the appropriate case to presume prejudice: the jury came into the courtroom to view a piece of evidence, any deliberations in the courtroom were brief and in the presence of the judge. Under these circumstances, there is no reason to think that their verdict was adversely affected by spectators.

## IV.

For the foregoing reasons, the Court DENIES Bacall's petition for a writ of habeas corpus. But the Court believes that rational jurists could debate this Court's resolution of Bacall's Confrontation Clause and Due Process Clause claims based on the prosecution's remarks during closing argument. And the Court believes that rationale jurists could debate this Court's conclusion that the jury's in-courtroom deliberation was not structural error. Accordingly, the Court GRANTS Bacall a certificate of appealability on these three issues. The Court otherwise DENIES Bacall a certificate of appealability.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
Dated: November 4, 2016                   U.S. DISTRICT JUDGE

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 4, 2016.

s/Keisha Jackson
Case Manager